UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL MILLER; and MARY MILLER, | |
| Plaintiffs, | |
| v. | No. 17-CV-4698 (KMK) |
| ANTHONY ANNUCCI, *et al.*, | OPINION & ORDER |
| Defendants. | |

Appearances:

Daniel Miller
Albion, NY
*Pro Se Plaintiff*

Julinda A. Dawkins, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

Daniel Miller ("Plaintiff") currently incarcerated at Orleans Correctional Facility

("Orleans"), and his mother Mary Miller ("Ms. Miller"), bring this pro se Action, pursuant to 42

U.S.C. § 1983 and § 1985; the Prison Rape Elimination Act ("PREA"); and the New York State

Constitution, against numerous officials at Franklin Correctional Facility ("Franklin") and Green

Haven Correctional Facility ("Green Haven").[1]  (*See* Second Am. Compl. ("SAC") 1–2 (Dkt. No.

---

[1] Defendants are: Anthony Annucci ("Annucci"), Jason Effman ("Effman"), Thomas
Griffin ("Griffin"), Jaifa Collado ("Collado"), Robert Bentivegna ("Bentivegna"), Joseph Lewis
("Lewis"), FNU Trembath ("Trembath"), Sergeant Brown ("Brown"), Sergeant Funk ("Funk"),
Sergeant Howard ("Howard"), C.O. Evangeline Nunez ("Nunez"), Ted Meskunas ("Meskunas"),
Mr. Jarvis ("Jarvis"), Joseph Bonnacci ("Bonnacci"), Sergeant Brock ("Brock"), C.O. Pollen
("Pollen"), Steven Maher ("Maher"), Sergeant Johannesman ("Johannesman"), Eric Guttwein
("Guttwein"), Sergeant Castine ("Castine"), Martha Ball ("Ball"), Marissa Ouida ("Ouida"), Mr.
Quimby ("Quimby"), Sergeant Reynolds ("Reynolds"), C.O. Tanya Rookwood ("Rookwood"),
Denise Sauther ("Sauther"), Ronald Foster ("Foster"), Lieutenant Hann ("Hann"), C.O. Griffiths

166).)  Before the Court is a Motion To Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6); 28 U.S.C. § 1404(a); and 42 U.S.C § 1997e(a) filed by Annucci, Effman, Griffin, Collado, Bentivegna, Lewis, Brown, Funk, Howard, Nunez, Meskunas, Jarvis, Bonnacci, Brock, Pollen, Maher, Johannesman, Guttwein, Castine, Ball, Ouida, Quimby, Reynolds, Rookwood, Sauther, Foster, and Compo (collectively, "Moving Defendants").  (*See* Not. of Mot. To Dismiss; Decl. of Sofya Uvaydov in Supp. of Mot. To Dismiss ("Uvaydov Decl."); Defs.' Mem. in Supp. of Mot. To Dismiss ("Defs.' Mem. re Mot. To Dismiss") (Dkt. Nos. 210, 211, 212).) [2]  Also before the Court is Plaintiff's Motion for Sanctions in connection with nonparty declarations filed by Moving Defendants' counsel.  (*See* Mot. for Sanctions (Dkt. No. 237).)

For the reasons stated herein, the Motion for Sanctions is denied, the Motion To Dismiss is granted in part, and the Court orders the Parties to conduct limited discovery on the question of administrative exhaustion.

## I.  Background

### A.  Factual Background

The following facts are drawn from the Second Amended Complaint ("SAC") and are taken as true for the purpose of resolving the instant Motion.

---

("Griffiths"), Donald Mitchell ("Mitchell"), Sergeant Compo ("Compo"), Sergeant Anspach ("Anspach"), and Nicole Chilton ("Chilton") (collectively, "Defendants").

[2] Moving Defendants' counsel notes that Mitchell, Anspach, Hann, Griffin, and Chilton are not parties to the Motion To Dismiss.  (Defs.' Mem. in Supp. of Mot. To Dismiss 1 n.1, 10 n.8.)  The Court nevertheless has authority to dismiss the claims against these Defendants sua sponte on the grounds discussed here pursuant to 28 U.S.C. § 1915(e)(2)(B), which states that "the [C]ourt shall dismiss the case at any time if the [C]ourt determines that . . . the [A]ction . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."

Plaintiff initially provides some "background information" on transfers to various New York Department of Corrections and Community Supervision ("DOCCS") facilities as an inmate from 2015 to 2017.  (SAC ¶¶ 46–60.)  He alleges the transfers occurred in "retaliation" for the many grievances he has filed over the years.  (*Id*.)  For this particular Action, Plaintiff goes on to describe certain incidents that occurred at Franklin, Upstate Correctional Facility ("Upstate"), and Green Haven, which are summarized below.

### 1.  Franklin Claims

Plaintiff alleges that on May 11, 2017, at 10:00 a.m., he was called to the facility package room.  (*Id.* ¶ 61.)  When he arrived, Foster and Reynolds made Plaintiff wheel his wheelchair to the package room and were allegedly furious at Plaintiff for filing grievances about the facility. (*Id.* ¶¶ 61–62.)  Foster allegedly threatened Plaintiff, stating that he "was planning on opening the handicapped telephones for everyone to use," but that if Plaintiff kept filing grievances, he would "put out a memo stating that [Plaintiff is] the reason" the handicapped telephones would not be open "for everyone to use," suggesting that the other inmates would then be angry with Plaintiff.  (*Id.* ¶ 62.)  Reynolds also threatened Plaintiff.  (*Id.* ¶ 63.)

Plaintiff also alleges that on May 12, 2017, at around 8:30 a.m., Jarvis entered the G-2 laundry room, saw Plaintiff, and made a comment about Plaintiff being a "child molester who likes to write grievances."  (*Id.* ¶ 66.)  At 8:45 a.m., Plaintiff allegedly overheard Jarvis stating that he, along with Meskunas, Griffin, Foster, and Reynolds, were "going to get rid of [Plaintiff] very soon" because Plaintiff was filing grievances about the broken toilets and showers.  (*Id.* ¶ 67.)

After completing a phone call at the "main school" around 11:00 a.m., (*id.* ¶ 70), Plaintiff alleges that Compo and Lewis took him to the back of the school building and informed Plaintiff

that Lewis was investigating allegations of sexual assault against another inmate, (*id*. ¶¶ 78–80). Lewis allegedly told Plaintiff that, over the course of the investigation, he had actually discovered evidence that Plaintiff had conspired with a correction officer to drug and "manipulat[e]" another inmate into sexual activity.  (*Id*. ¶ 81.)  Lewis allegedly told Plaintiff that he needed Plaintiff to help "cooperat[e] against" that correction officer.  (*Id*. ¶ 82.)  Plaintiff stated that he did not want to do so, but Lewis and Compo "became enraged" by Plaintiff's refusal and began threatening Plaintiff.  (*Id*. ¶ 83.)  Lewis allegedly stated that he, Compo, Castine, Reynolds, Foster, and Meskunas all "discussed this" and had all agreed that they wanted to "get rid of" Plaintiff because he was a "predator and child molester" and filed too many grievances and complaints.  (*Id*.)  Plaintiff alleges that Lewis stated that Plaintiff had "one chance to give [him and Compo] information" about the alleged sexual activities or else they would "beat the shit out of" Plaintiff.  (*Id*.)

Following this verbal confrontation, Plaintiff alleges that he was physically assaulted by Castine in a medical examination room, who "violently kicked [Plaintiff's] right foot out from under him, causing him to fall to the floor."  (*Id*. ¶¶ 87–89.)  Compo then allegedly punched Plaintiff in the stomach.  (*Id*. ¶ 90.)  During this time, Plaintiff alleges that Castine was also present and that Ouida was outside and "laughing [and] jeering" at Plaintiff.  (*Id*. ¶¶ 88, 91.)

At 1:15 p.m., Mitchell allegedly came into the examination room and punched Plaintiff "in the testicles" and threatened him, saying Plaintiff's grievances "won't go anywhere."  (*Id*. ¶ 92.)

Following the alleged assault, Plaintiff was examined by a doctor and taken to the Franklin emergency room.  (*Id*. ¶¶ 96–99.)  Plaintiff alleges that Compo, Chilton, and Ouida were present when Brown entered the room with a camera.  (*Id*. ¶ 99.)  Chilton, a nurse, was

4

"making notes in a chart" and asked Plaintiff questions.  (*Id.*)  Brown then ordered Plaintiff to stand and disrobe to his underwear, and Brown began to take pictures.  (*Id.* ¶ 100.)  Brown then allegedly ordered Plaintiff to "drop [his] drawers," but Plaintiff objected on "religious grounds" because there were women present.  (*Id.* ¶ 101.)  Plaintiff was eventually forced to oblige and alleges that Brown subsequently made inappropriate comments about Plaintiff's body and used the word "fag" to refer to Plaintiff.  (*Id.* ¶¶ 102–05.)

Afterwards, Plaintiff sat back into his wheelchair and was wheeled over to an examination table "to use for leverage while [Plaintiff] got dressed."  (*Id.* ¶ 108.)  Plaintiff alleges that while he was leaning over the table and attempting to lift himself up to get dressed, either Ouida or Compo shoved a "hard object . . . into [Plaintiff's] rectum" while Compo said, "What? Don't you queers like it in the ass?"  (*Id.* ¶¶ 110–11.)  Following the assault, Compo and Ouida allegedly warned Plaintiff not to tell anyone about it "if he knew what was good for him." (*Id.* ¶ 112.)  Ellingsworth also allegedly threatened Miller not to say anything.  (*Id.* ¶ 116.)

Plaintiff subsequently began experiencing chest pain and was taken to Albany Medical Center, an outside hospital.  (*Id.* ¶¶ 113, 119.)  Upon discharge, Plaintiff alleges that he was taken to Upstate, where a nonparty correction officer allegedly informed Plaintiff that Quimby, Sauther, Meskunas, Foster, Reynolds, Compo, Castine, Brown, Lewis, and Jarvis had all "been involved in the decision making process to concoct a scheme to get [Plaintiff] moved out of" Franklin.  (*Id.* ¶ 123.)  Further, Plaintiff was informed of a misbehavior report allegedly filed by Castine regarding events at Franklin, alleging that, on May 12, 2017, at 3:30 p.m., Plaintiff was "out of place" when he was in the laundry room at G-2 and that on May 11, 2017, at 3:00 a.m., he engaged in "a sexual act" and had "physical contact" with another inmate.  (*Id.* ¶¶ 126–29.)

### 2. Green Haven Claims

On May 18, 2017, Plaintiff was transferred to Green Haven. (*Id*. ¶ 133.) Plaintiff alleges that it was an "extremely hot, humid day" and that during transfer, Plaintiff began experiencing heat exhaustion. (*Id*. ¶ 134.) Plaintiff was taken to Albany Medical Center for treatment. (*Id*. ¶ 135.) Later that day, Plaintiff arrived at Green Haven and was taken to the infirmary, where he was placed in a "suicide watch room." (*Id*. ¶ 137.)

At Green Haven, on May 19, 2017, Plaintiff attempted to file a report about the sexual assault he experienced at Franklin and was allegedly told by Pollen and Johannesman that they "would not take any report." (*Id*. ¶ 139.) He was then transferred to the "Psychiatric Services Unit," where Plaintiff told a different sergeant "what was going on." (*Id*. ¶ 140.) This unnamed sergeant allegedly "took notes[] and said she would ask her supervisor, the Watch Commander, a Lieutenant, what she should do." (*Id*.) Plaintiff alleges that he did not hear from her again. (*Id*. ¶ 141.) Plaintiff returned to the infirmary after experiencing more chest pains on May 22, 2017. (*Id*. ¶¶ 142–43.)

Plaintiff alleges that on May 22, 2017, Howard arrived at the infirmary and "gave him a list of employee assistants" to select an assistant for Plaintiff's upcoming disciplinary hearing. (*Id*. ¶ 144.) Plaintiff chose three names "at random," and Howard returned, stating that he would be the assistant. (*Id*. ¶¶ 144–45.) Plaintiff alleges that he requested that Howard obtain a copy of the misbehavior report, a copy of Plaintiff's medical records, copies of the Franklin G-2 Log Book for the relevant days, and interview several witnesses, but Howard allegedly "never got back to" Plaintiff. (*Id*. ¶ 146.) Howard also allegedly told Plaintiff that he would not "get[] involved with details" and was only willing to provide "cases, directives[,] or books." (*Id*. ¶ 148.)

Plaintiff's disciplinary hearing occurred on June 1, 2017 in front of Guttwein and "an observer from Albany." (*Id*. ¶ 150.) Guttwein allegedly adjourned the hearing due to a problem with the date and time on the misbehavior reports issued against Plaintiff. (*Id*. ¶¶ 126–28, 160.) On July 5, 2017, Plaintiff was told that Guttwein had dismissed all charges against Plaintiff. (*Id*. ¶ 169.) Plaintiff had allegedly been in "administrative prehearing confinement" prior to and during this waiting period, and alleges that, as a result of the delay in dismissal of the charges, he spent 56 days with no recreation time and no access to soap, deodorant, shampoo, toothpaste, or a toothbrush. (*Id*. ¶¶ 161, 177–87.) Plaintiff also alleges that he was unable to contact his mother during this time. (*Id*. ¶¶ 181–83.) During his confinement, Plaintiff alleges that he was "subjected to fowl [sic] treatment by Pollen, Nunez, Funk, Johannesman, and Brock." (*Id*. ¶ 184.) Plaintiff also alleges that he did not shower because "the shower unit was ice cold water." (*Id*. ¶ 189.) Plaintiff also alleges that Funk, Johannesman, and Brock all called Plaintiff homosexual slurs during this time. (*Id*. ¶ 191.)

In late May and June 2017, Plaintiff sent "numerous letters" to Annucci, Effman, Maher, and Griffin about sexual harassment and assault that he experienced at Green Haven and Franklin. (*Id*. ¶ 204.) Plaintiff alleges that Ball was supposed to investigate Plaintiff's sexual assault and harassment claims, but instead made "hostile" comments to Plaintiff, stating that prison staff "don't really believe sex offenders who cry rape." (*Id*. ¶ 205–06.)

Plaintiff also alleges that he has multiple medical conditions that lead to heart problems, an inability to walk, and sleep apnea. (*Id*. ¶¶ 210–22.) Plaintiff alleges that Bentivegna refused to issue Plaintiff a breathing machine to help Plaintiff with his sleep apnea even though Plaintiff allegedly had access to one at previous DOCCS facilities. (*Id*. ¶ 223.) Later, however, on August 4, 2017, Plaintiff received his property from Franklin and once "again had his breathing

machine." (*Id.* ¶ 224.)  Plaintiff also alleges that Bentivegna did not permit Plaintiff to take his medication in his cell due to Plaintiff's "mental health problems" and that, due to Plaintiff's mobility problems, Plaintiff has been unable to go to the medical unit for medication and "has missed several doses of necessary heart medication." (*Id.* ¶¶ 228–29.)

Plaintiff also alleges multiple incidents of assault or attempted assault perpetrated by Bentivegna, Rookwood, and Griffin that occurred in fall 2017. (*Id.* ¶¶ 237–41.)  On August 23, 2017, Bentivegna allegedly "str[uck] [Plaintiff] in the face with a 1 inch thick folder," causing "pain, bruising, and swelling." (*Id.* ¶ 237.)  Rookwood allegedly tried to have another inmate stab Plaintiff in October and November 2017. (*Id.* at ¶¶ 239–40.)  Rookwood allegedly "struck [P]laintiff in the face with her baton" on March 3, 2018. (*Id.* ¶ 238.)

Plaintiff further refers to being detained in "keeplock" between October 2017 and March 2018 and alleges that Rookwood, Griffith, Johannesman, Anspach, and Hann all repeatedly harassed him during that period and further into May 2018. (*Id.* ¶¶ 245–46.)  Plaintiff also alleges that Anspach and Rookwood filed "retaliatory disciplinary report[s]" in March 2018. (*Id.* ¶¶ 242–44.)  Plaintiff also alleges that on March 11, 2018, Rookwood printed out "classified and confidential information" pertaining to Plaintiff's criminal history and mental health and posted it on "the bulletin board in the C-4 housing unit." (*Id.* ¶ 247.)

Plaintiff further alleges that Pollen, Nunez, Rookwood, and Griffith all create a "climate of fear and intimidation." (*Id.* ¶¶ 249, 256.)  He also alleges that Nunez and Pollen "attempted to have two inmates assault [P]laintiff," and that Rookwood, Griffith, Anspach, Johannesman, and Hann did the same. (*Id.* ¶¶ 250–51, 254.)  Plaintiff alleges that he "filed grievances for each and every allegation" in the SAC but also claims that some grievances were stolen out of the mail by

Pollen and Nunez. (*Id*. ¶¶ 255–56.) Plaintiff notes that many of his grievances are "still pending

CORC decisions." (*Id*. ¶ 259.)

On the basis of these facts, Plaintiff and Ms. Miller seek declaratory relief, (*id*. at 55–56),

preliminary and permanent injunctions, (*id*. at 56–57), and a monetary judgment of $5 million

each, (*id*. at 57).

B.  Procedural Background

Plaintiff filed his Complaint and Request to Proceed In Forma Pauperis ("IFP") on June

21, 2017. (*See generally* Compl. (Dkt. No. 1); Dkt. No. 2.) Plaintiff was granted IFP status on

July 6, 2017. (Dkt. No. 7.) On September 1, 2017, Plaintiff sought leave to amend the

Complaint. (Dkt. No. 34.) The Court permitted Plaintiff to file an amended complaint, which

was filed on January 23, 2018. (*See* Dkt. Nos. 85, 86.) Plaintiff then requested to amend again

on June 21, 2018. (Dkt. No. 148.) The Court granted leave to do so on July 3, 2018. (Dkt. No.

151.) The SAC was filed on October 12, 2018. (*See generally* SAC.) Plaintiff sought leave to

file a third amended complaint on November 5, 2018, (Dkt. No. 182), but the Court denied this

request, (Dkt. No. 184).

On January 9, 2019, Moving Defendants filed their Motion To Dismiss. (*See* Not. of

Mot. To Dismiss.) On February 21, 2019, Plaintiff filed an Opposition to the Motion To Dismiss.

(Pl.'s Mem. in Opp'n to Mot. To Dismiss ("Pl.'s Mem. re Mot. To Dismiss"); Pl.'s Decl. in

Opp'n to Mot. To Dismiss ("Pl.'s Decl. re Mot. To Dismiss") (Dkt. Nos. 230, 231).) On March

4, 2019, Plaintiff filed a Motion for Sanctions. (*See* Mot. for Sanctions; Pl.'s Decl. in Supp. of

Mot. for Sanctions re Passage Decl. ("Pl.'s Decl. re Passage Decl."); Pl.'s Decl. in Supp. of Mot.

for Sanctions ("Pl.'s Decl. re Mot. for Sanctions") (Dkt. Nos. 239, 240).) On March 11, 2019,

Moving Defendants filed an Opposition to the Motion for Sanctions. (*See* Defs.' Letter in Opp'n

to Mot. for Sanctions ("Defs.' Mem. re Mot. for Sanctions") (Dkt. No. 243).)  On March 27,

2019, Moving Defendants filed a Reply in Support of the Motion to Dismiss.  (*See* Defs.' Reply

in Supp. of Mot. To Dismiss ("Defs.' Reply re Mot. To Dismiss") (Dkt. No. 253).)

## II.  Discussion

### A.  Motion for Sanctions

Plaintiff alleges that various witness declarations filed by Moving Defendants' counsel—

at the time, Sofya Uvaydov ("Uvaydov")—were false and that Uvaydov was aware of their

falsehood.  (*See generally* Mot. for Sanctions; Pl.'s Decl. re Passage Decl.; Pl.'s Decl. re Mot. for

Sanctions; Dkt. Nos. 219–21 (nonparty declarations at issue).)  Federal Rule of Civil Procedure

11, in relevant part, imposes a duty on every attorney to "certif[y] that to the best of the

[attorney's] knowledge, information, and belief, formed after an inquiry reasonable under the

circumstances . . . the factual contentions have evidentiary support or, if specifically so

identified, will likely have evidentiary support after a reasonable opportunity for further

investigation or discovery."  Fed. R. Civ. P. 11(b).  "The standard for triggering the award of fees

under Rule 11 is objective unreasonableness . . . ."  *Storey v. Cello Holdings, L.L.C.*, 347 F.3d

370, 387 (2d Cir. 2003) (citation, alteration, and quotation marks omitted).  "With regard to

factual contentions, 'sanctions may not be imposed unless a particular allegation is utterly

lacking in support.'"  *Id*. at 388 (quoting *O'Brien v. Alexander*, 101 F.3d 1479, 1489 (2d Cir.

1996)).  "Courts maintain a high bar for establishing a Rule 11 violation given judicial concern

for encouraging zealous advocacy . . . ."  *E. Gluck Corp. v. Rothenhaus*, 252 F.R.D. 175, 179

(S.D.N.Y. 2008).

The Court does not see any reason to impose sanctions on Uvaydov.[3]  Plaintiff himself acknowledges with regard to the Passage Declaration that he has "no evidence to show that counsel knew, or should have known that the [Passage Declaration] was knowingly false, perjured testimony."  (Pl.'s Decl. re Passage Decl. ¶ 4.)  Even if the content of the declarations was proven false, Uvaydov was only required to conduct "an inquiry reasonable under the circumstances" as to whether the facts have evidentiary support.  *See Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1330 (2d Cir. 1995) (quoting Fed. R. Civ. P. 11(b)).  Uvaydov was not "required to certify that [her] representations [were] 'well grounded in fact.'"  *Id.* (quoting Fed. R. Civ. P. 11).  Through the evidentiary documents submitted in connection with the declarations, it is clear that Uvaydov has met her duties under Rule 11.  (*See generally* Dkt. Nos. 219–21, 233.)

Further, the Court "will not evaluate the merits of the [P]arties' claims and defenses" for the purposes of a Rule 11 motion, and the kinds of issues raised by Plaintiff in the Motion for Sanctions "require[] discovery to resolve properly."  *E. Gluck*, 252 F.R.D. at 181.  In fact, Plaintiff himself admits that he "fully intend[s] to develop through discovery and at trial" the falsehood of the content of the declarations, (Pl.'s Decl. re Mot. for Sanctions ¶ 44), and offers evidence in the form of other affidavits and documents to contest the assertions made in the underlying declarations, (*see generally id.*).  "[E]verything [] the Plaintiff points to are [sic] really indicative of factual disputes, and thus . . . do not constitute sanctionable conduct."  *Emerald Asset Advisors, LLC v. Schaffer*, 895 F. Supp. 2d 418, 438 (E.D.N.Y. 2012).  Accordingly, Plaintiff's Motion for Sanctions is denied.

---

[3] Rule 11 only authorizes impositions of sanctions on "an attorney, law firm or party," Fed. R. Civ. P. 11(c), not non-party declarants.  To the extent Plaintiff requests the Court impose sanctions on the individual declarants, that is denied.

B.  Motion To Dismiss

    1.  Standards of Review

       a.  Rule 12(b)(6)

The Supreme Court has held that, while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations, quotation marks, and alterations omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."  *Id.* (quotation marks and alteration omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff need allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not 'show[n]' — 'that the pleader is entitled to relief.'" (citation omitted) (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the

hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) ("In addressing the sufficiency of a complaint we accept as true all factual allegations . . . . " (quotation marks omitted)). Further, "[f]or the purpose of resolving [a] motion to dismiss, the Court . . . draw[s] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Where, as here, a plaintiff proceeds pro se, the "complaint[] must be construed liberally and interpreted to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (per curiam) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

Generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks and citation omitted). When a plaintiff proceeds pro se, however, the Court may consider "materials outside the complaint to the extent that they are consistent with the

allegations in the complaint," *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted), including, as relevant here, "documents that a pro se litigant attaches to his opposition papers," *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted).

  b.  Rule 12(b)(3)

On a motion to dismiss a complaint under Rule 12(b)(3) for improper venue, "the plaintiff bears the burden of establishing that venue is proper." *Ne. Landscape & Masonry Assocs., Inc. v. State of Conn. Dep't of Labor*, No. 14-CV-9104, 2015 WL 8492755, at *2 (S.D.N.Y. Dec. 10, 2015) (quoting *Fedele v. Harris*, 18 F. Supp. 3d 309, 316 (E.D.N.Y. 2014)). In analyzing a claim of improper venue, the court must view all facts in the light most favorable to the plaintiff. *See Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir. 2007). Thus, a "[c]ourt must accept the facts alleged in the complaint and construe all reasonable inferences in the plaintiff's favor." *Ne. Landscape*, 2015 WL 8492755, at *2 (citation omitted).

The permissible venue in this Action is determined by the general venue provision for cases involving a federal question. *See* 28 U.S.C. § 1391(b). Under that statute, venue can be laid "in either (1) the district of the defendant's residence; (2) the district where a substantial part of the events giving rise to the claim occurred; or (3) if neither of those can be applied, any district where a defendant is subject to personal jurisdiction." *Ne. Landscape*, 2015 WL 8492755, at *2 (citation omitted). "[W]hen a plaintiff relies on [§] 1391(b)(2) to defeat a venue challenge," a district court must engage in a two-step inquiry: first, "identify the nature of the claims and the alleged acts or omissions giving rise to the claims"; and second, "determine whether a substantial part of the acts or omissions occurred in the district where the suit was filed." *Fedele*, 18 F. Supp. 3d at 316 (citing *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408,

432 (2d Cir. 2005)).  For venue to be proper under § 1391(b)(2), "*significant* events or omissions *material* to the plaintiff's claim must have occurred in the district in question, even if other material events occurred elsewhere." *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 357 (2d Cir. 2005) (emphasis in original).  However, "[w]hen considering a motion to dismiss for improper venue under Rule 12(b)(3), 'the plaintiff need only make a prima facie showing of venue.'" *Dash v. Bank of Am. Corp.*, No. 18-CV-4807, 2019 WL 1780140, at *4 (S.D.N.Y. Apr. 23, 2019) (italics omitted) (quoting *Gulf Ins. Co.*, 417 F.3d at 355).  Where venue is improper, a court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *Fedele*, 18 F. Supp. 3d at 319 (quoting 28 U.S.C. § 1406(a)); *see also Daniel*, 428 F.3d at 435 (noting that a court must decide whether to "simply affirm dismissal on these [improper venue] grounds or, in the interest of justice, order transfer of the action to another district where jurisdiction and venue properly obtain").

Even where venue is proper, a court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  In determining whether to transfer, courts should first inquire "whether the action could have been brought in the transferee district." *Nelson v. Wells Fargo Bank, N.A.*, No. 17-CV-4045, 2019 WL 2514229, at *7 (S.D.N.Y. June 18, 2019) (quoting *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 743 (S.D.N.Y. 2013)). Following that, the Court must consider a variety of other factors, including:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Id.* (citation omitted).  On a motion to transfer venue pursuant to § 1404(a), the "burden rests on the moving party to make a clear and convincing showing that the balance of these factors favors their choice of forum."  *Lapa v. Massage Envy Franchising, LLC*, No. 18-CV-7403, 2019 WL 2004072, at *2 (S.D.N.Y. May 7, 2019) (citation and quotations omitted).

    2.  Analysis

Moving Defendants argue that "[a]ll but one of Plaintiff's claims fail because it is apparent from the face of the [SAC], and the timing of the filing of this lawsuit, that he failed to exhaust administrative remedies prior to commencing the present action."  (Defs.' Mem. re Mot. To Dismiss 1.)  Moving Defendants further argue that all exhausted claims pertain only to incidents that occurred at Franklin—located in the Northern District of New York—and that, accordingly, venue in this District is improper or, alternatively, that the Court should exercise its discretion to transfer the remaining claims to the Northern District.  (*Id.* at 32–35.)  Moving Defendants also argue that, regardless of the exhaustion issue, Plaintiff and Ms. Miller fail to state a claim for any of the incidents that do not pertain to the alleged sexual assault or harassment and that Moving Defendants are entitled to qualified immunity.  (*Id*. at 18–31.)  The Court will address each argument as needed.

    a.  Venue

The first alleged assault occurred entirely at Franklin.  (SAC ¶¶ 61–122.)  Following that, Plaintiff alleges he was transferred to Upstate on May 15, 2017.  (*Id*. ¶ 123.)  Both of these facilities are located in the Northern District of New York.  Moving Defendants argue that, in the event that all the non-sexual assault or harassment claims are dismissed for failure to exhaust, the Court should transfer this Action to the Northern District of New York because the alleged sexual assault and harassment occurred only at Franklin and because Franklin personnel are located in

16

the Northern District of New York.  (*See* Defs.' Mem. re Mot. To Dismiss 32–35.)  Without first

addressing the question of exhaustion, the Court agrees that any claims related to events that

occurred at Franklin and Upstate should be severed and transferred to the Northern District.

Courts may, in their discretion, "sever and transfer a claim against one or more

defendants where the administration of justice would be materially advanced thereby."  *See*

*Randle v. Alexander*, 960 F. Supp. 2d 457, 486 (S.D.N.Y. 2013) (citation and quotation marks

omitted).  When determining whether to sever and transfer, a court should examine:

> (1) whether the issues sought to be tried separately are significantly different from
> one another, (2) whether the separable issues require the testimony of different
> witnesses and different documentary proof, (3) whether the party opposing the
> severance will be prejudiced if it is granted[,] and (4) whether the party requesting
> the severance will be prejudiced if it is not granted.

*Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 104 F. Supp. 2d 279, 288 (S.D.N.Y.

2000) (citation and quotation marks omitted).

Under 28 U.S.C. § 1391(b), venue is appropriate in:

> (1) a judicial district in which any defendant resides, if all defendants are residents
> of the State in which the district is located; (2) a judicial district in which a
> substantial part of the events or omissions giving rise to the claim occurred, or a
> substantial part of the property that is the subject of the action is situated; or (3) if
> there is no district in which an action may otherwise be brought . . ., any judicial
> district in which any defendant is subject to the court's personal jurisdiction with
> respect to such action.

28 U.S.C. § 1391(b).  For purposes of venue, state employee defendants are considered residents

of the district in which they work.  *See Smolen v. Brauer*, 177 F. Supp. 3d 797, 801 (W.D.N.Y.

2016).  The Franklin and Upstate Defendants accordingly reside in the Northern District of New

York, and the Green Haven Defendants reside in the Southern District of New York.  Because all

Defendants are residents of New York, this makes both the Northern and Southern Districts

proper venues under § 1391(b)(1).  However, even if venue is proper, a court may transfer an

action to a different venue pursuant to 28 U.S.C. § 1404(a) "[f]or the convenience of parties" and "in the interest of justice."  28 U.S.C § 1404(a).

Here, the Court deems it appropriate to sever and transfer the claims pertaining to Franklin and Upstate to the Northern District of New York.  "Apart from [Plaintiff's] allegation[s] as to the motivation behind the alleged harassment and abuse," i.e., the nature of Plaintiff's conviction, Plaintiff's serial grievances, and Plaintiff's sexual orientation, (*see* SAC ¶ 41), "there does not appear to be any other questions of fact common to [P]laintiff's claims against" the Green Haven Defendants and the Franklin or Upstate Defendants.  *James v. Osborne*, No. 11-CV-4182, 2012 WL 4849131, at *5 (E.D.N.Y. Apr. 18, 2012), *adopted by* 2012 WL 4849160 (E.D.N.Y Oct. 11, 2012).  Even though some of Plaintiff's Green Haven allegations tangentially relate to incidents that occurred at Franklin—such as Plaintiff's allegedly unsuccessful attempts to report the sexual assault, (*see* SAC ¶¶ 138–43), and the subsequent disciplinary hearing on the allegedly false misbehavior report filed by Castine, (*see id.* ¶¶ 126, 144–76)—this "does not change the fact that the [Northern] District[] of New York [is] the [] loc[us] of operative facts relating to" the alleged sexual assault itself, as well as any alleged "illegal segregation", (*see id.* ¶ 123), that occurred at Upstate.  *James*, 2012 WL 489131, at *6. The assaults in each facility are alleged against different Defendants and involve different circumstances.  All of the Franklin and Upstate incidents are "distinct from those arising out of incidents at [Green Haven]," and are thus "properly severed and transferred to the Northern District of New York."  *Melendez v. Wilson*, No. 04-CV-73, 2006 WL 2621083, at *7, 10 (S.D.N.Y. Sept. 12, 2006) (severing and transferring claims pertaining to incidents that occurred at Upstate to the Northern District of New York, even though Upstate personnel "approached and threatened" plaintiff about incidents that occurred at Sing Sing, located in the Southern District

of New York); *see also Reid v. Nuttall*, No. 08-CV-870, 2010 WL 2025477, at \*11 (W.D.N.Y. Mar. 11, 2010) (severing and transferring claims from the Western District of New York to the Northern District of New York where allegations of constitutional violations occurred in prisons located in the Northern District).

After engaging in the two-step inquiry described in *Solar*, this Court also concludes that transfer of the severed claims to the Northern District is proper under 28 U.S.C § 1404(a). *See* 707 F. Supp. 2d at 442. The first step of the § 1404(a) evaluation is met because the Plaintiff could have brought claims related to Franklin and Upstate in the Northern District under 28 U.S.C. § 1391(b). Further, even after "giving due deference to [Plaintiff's] choice of forum, this Court finds that the balance of convenience and justice weighs heavily in favor of" transfer to the Northern District. *Id*. at 442 (citation, alterations, and quotation marks omitted.) Plaintiff is "currently incarcerated at [Orleans] in the Western District of New York—which is closer to the Northern District than this District—meaning this critical factor weighs in favor of transfer." *Id*. (citation omitted). The Franklin and Upstate Defendants also reside in the Northern District, as state-employee defendants are considered residents of the district in which they work, and Plaintiff does not otherwise allege that it would somehow be more convenient for them to come to the Southern District. *See Smolen*, 177 F. Supp. at 801. Due to the convenience of electronic production, "[t]he location of relevant documents and the ease of access to sources of proof is mostly a neutral factor," *Tlapanco v. Elges*, 207 F. Supp. 3d 324, 330–31 (S.D.N.Y. 2016), but even if the Court were to consider it, any related documentation or proof pertaining to the Franklin or Upstate incidents would be located in the Northern District, not the Southern District. Further, Plaintiff, in his Opposition, (*see generally* Pl.'s Mem. re Mot. To Dismiss), does not provide any documentation that there are witnesses who would "not voluntarily testify" in the

Northern District or that litigating it in the Northern District would be "financially burdensome"; therefore, these two factors are neutral. *Id*. at 332 (citations and quotation marks omitted). Finally, "[t]he locus of operative facts is a primary factor in determining whether to transfer venue." *Steck v. Santander Consumer USA Holdings Inc.*, No. 14-CV-6942, 2015 WL 3767445, at *6 (S.D.N.Y. June 17, 2015) (citation and quotation marks omitted). "In determining the locus of operative facts, courts look to the site of the events from which the claim arises." *Mastr Asset Backed Sec. Tr. 2007-WMC1 v. WMC Mortg. LLC*, 880 F. Supp. 2d 418, 423 (S.D.N.Y. 2012) (citation and quotation marks omitted). Here, it is clear that "the operative facts [of the Franklin and Upstate claims] have a minimal connection to the [Southern] District," particularly because the "sexual assaults" and any related retaliation at Franklin or Upstate occurred in the Northern District. *Crandell v. Ross*, No. 17-CV-755, 2019 WL 3302819, at *5–6 (N.D.N.Y. July 23, 2019) (transferring sexual assault and harassment claims to the district in which the underlying incidents occurred). The incidents at Green Haven involve different Defendants, circumstances, and alleged violations. Accordingly, all claims related to Franklin or Upstate are severed and transferred to the Northern District of New York. The Court addresses the remaining claims, which arise solely from the Green Haven incidents, below.

b.  PREA Reporting Violations

Plaintiff alleges that Pollen, Nunez, Funk, Johannesman, and Brock all "refused to allow [Plaintiff] to use the telephone reporting system, in violation of [the] PREA." (SAC ¶ 207.) The Court interprets these allegations to state a claim against the Defendants for violation of the PREA. Even accepting Plaintiff's allegations as true, "[t]o the extent that Plaintiff's claim is based on a failure to investigate his allegations of sexual assault under [PREA], it must be dismissed because nothing in the statute suggests that PREA intended to establish a private claim

for allegations of prison rape, and every court to address the issue has determined that PREA cannot support such a claim by an inmate." *Abreu v. Brown*, No. 14-CV-6599, 2018 WL 565280, at *9 (W.D.N.Y. Jan. 22, 2018) (citation and quotation marks omitted); *Morgan v. Shivers*, No. 14-CV-7921, 2018 WL 618451, at *7 (S.D.N.Y. Jan. 29, 2018) (same). Accordingly, any independent cause of action under the PREA is dismissed.

c.  Administrative Exhaustion

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citations omitted). The exhaustion requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 520, 532 (2002), and includes actions for monetary damages even if monetary damages are not available as an administrative remedy, *see Booth v. Churner*, 532 U.S. 731, 740–41 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, alterations, and quotation marks omitted). Indeed, the PLRA demands "strict compliance with the grievance procedure . . . , or else dismissal must follow inexorably." *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (citations, alteration, and quotation marks omitted). Exhaustion must occur *prior* to Plaintiff's filing suit; "[s]ubsequent exhaustion after suit is filed therefore is

insufficient." *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled in part on other grounds by Porter*, 534 U.S. 516.

The grievance program applicable here is the DOCCS Inmate Grievance Program ("IGP"), which provides for a "three-step grievance process." *See Colon v. Annucci*, 344 F. Supp. 3d 612, 641 (S.D.N.Y. 2018).

> To initiate the process, an inmate must file a written complaint with the Inmate Grievance Resolution Committee ("IGRC"), a facility committee composed of inmates and appointed staff members. *See* N.Y.C.R.R. § 701.4–.5. . . . Second, the inmate can appeal an unfavorable IGRC determination to the superintendent of the facility. *See* N.Y.C.R.R. § 701.5([c]) . . . . Finally, an inmate can appeal an unfavorable superintendent's determination to the Central Office Review Committee ("CORC"). *See* N.Y.C.R.R. § 701.[7]([c]) . . . ; Directive No. 4040.

*Amador v. Andrews*, 655 F.3d 89, 96–97 (2d Cir. 2011) (some citations omitted); *see also Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *1 (S.D.N.Y. Sept. 8, 2016) (describing three-step IGP procedure), *appeal dismissed*, 2016 WL 10100723 (2d Cir. Dec. 8, 2016). Grievances alleging "employee misconduct meant to annoy, intimidate[,] or harm an inmate" are subject to an expedited administrative review—they are immediately referred to the superintendent of the facility and must also be exhausted through a final appeal to CORC. *Amador*, 655 F.3d at 97 (quotation marks omitted) (citing 7 N.Y.C.R.R. §§ 701.2(e), 701.8(b)–(h).). Only after completing all three steps of the IGP may an inmate initiate suit, *see Ross*, 136 S. Ct. at 1856; *Williams*, 829 F.3d at 122, "provided no exception to exhaustion applies," *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *6 (S.D.N.Y. Dec. 21, 2018).

Exhaustion is generally an affirmative defense, so Moving Defendants bear the burden of proving failure to exhaust. *See McCoy*, 255 F. Supp. 2d at 247–48. Inmates are "not required to specially plead or demonstrate exhaustion in their complaints," *Jones v. Bock*, 549 U.S. 199, 216 (2007), but dismissal may be appropriate at the motion to dismiss stage "where failure to exhaust

is clear on the face of the complaint," *Brinson v. Kirby Forensic Psych. Ctr.*, No. 16-CV-1625, 2018 WL 4680021, at *6 (S.D.N.Y. Sept. 28, 2018) (citations omitted).

Here, many of Plaintiff's Green Haven claims—including alleged assaults and harassment that occurred in fall 2017 and spring 2018, (SAC ¶¶ 237–48), and Bentivegna's alleged indifference to Plaintiff's "serious medical needs," (SAC ¶ 234)—were raised for the first time in the SAC, which was filed on October 12, 2018, (*see generally id.*).  Moving Defendants argue that it is clear from the face of the Complaint that *all* Green Haven claims have not been exhausted, stating that Plaintiff "commenced this [A]ction on June 19, 2017, when [Plaintiff] mailed the initial [C]omplaint to the Clerk."  (Defs.' Mem. re Mot. To Dismiss 14.) However, under similar circumstances, courts have noted that the "PLRA does not bar a prisoner's motion [to amend] . . . to set out any transaction, occurrence, or event that happens after the date of the pleading . . . as long as the prisoner has exhausted his administrative remedies . . . prior to making such a motion."  *Tolliver v. Malin*, No. 12-CV-971, 2014 WL 1378447, at *8–9 (S.D.N.Y. Apr. 4, 2014) (refusing to apply the principle that "post-pleading occurrences . . . must be brought in a separate action" to survive the PLRA exhaustion requirement); *see also Anderson v. Spizziota*, No. 11-CV-5663, 2016 WL 11480707, at *29 n.21 (E.D.N.Y. Feb. 12, 2016) (noting that new, post-pleading occurrences do not need to have been "exhausted prior to the filing of the original complaint").[4]  This is especially true, given that the Second Circuit treats "[f]ailure to exhaust administrative remedies [as] often a temporary,

---

[4] Although the court in *Tolliver* interpreted the plaintiff's amendment there as a motion for leave to supplement the complaint under Federal Rule 15(d), rather than as a motion for leave to amend under Federal Rule 15(a), the court also noted that "the standard for determining the . . . motion is the same."  *Tolliver*, 2014 WL 1378447, at *7 (citation omitted).  The Court interprets the filing of the SAC as a motion for leave to amend under Federal Rule 15(a), but this does not materially affect the analysis.

curable, procedural flaw," and, as long as "the time permitted for pursuing administrative remedies has not expired, a prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit." *Snider v. Melindez*, 199 F.3d 108, 111–12 (2d Cir. 1999). Therefore, especially given the latitude ordinarily given to pro se plaintiffs, the appropriate question for the Court to determine now is whether Plaintiff exhausted claims related to the Green Haven incidents by October 12, 2018, the date the SAC was filed.

This clarification alone defeats some of Moving Defendants' arguments as to what is obvious from the face of the Complaint and related documents. For example, Moving Defendants argue that Plaintiff's various submissions to the Court contain at most one letter, dated June 7, 2017, that could constitute a grievance for the relevant time period between May 11, 2017, the earliest alleged incident, and June 21, 2017, the filing of the Complaint. (*See* Defs.' Mem. re Mot. To Dismiss 15; Letter from Plaintiff ("Pl.'s Grievance Letter") (Dkt. No. 24) at Dkt. No. 24-6, 2.) As discussed, the relevant exhaustion deadline is actually October 12, 2018, the date of the SAC, so Moving Defendants have pointed to evidence within an underinclusive range of dates.

Moving Defendants also point to one of Plaintiff's submissions made in support of his Sixth Motion for a Preliminary Injunction that purports to attach "all appeals filed by [Plaintiff]" in Exhibit H, noting that the attachments all post-date June 21, 2017. (*See* Defs.' Mem. re Mot. To Dismiss 15; Letter from Plaintiff ("Pl.'s PI Letter") 5, 139–46 (Dkt. No. 191).) To begin, only Plaintiff's Grievance Letter and exhibits attached to the Amended Complaint were arguably incorporated into the SAC by reference and may be considered by the Court. (SAC ¶ 258 ("As the [C]ourt is aware, over 50 grievances and complaint letters were supplied on August 14, 2017,

and an approximate 50 pages were appended to the [Amended Complaint].").)  Regardless, the

Court cannot conclude from only the existence of the June 7, 2017 letter or one assertion in a

separate submission related to a preliminary injunction about "all appeals filed by [Plaintiff],"

(Pl.'s PI Letter 5), that it is "clear on the face of the [SAC]" that Plaintiff has failed to exhaust all

his administrative remedies, *Brinson*, 2018 WL 4680021, at *6.  Indeed, it is not clear that

Plaintiff represented that he attached *all* the documentation he has regarding exhaustion of all the

underlying incidents.  Nor is it Plaintiff's burden to particularly allege administrative exhaustion

at this stage.  *See Voorhees v. Goord*, No. 05-CV-1407, 2006 WL 1888638, at *7 (S.D.N.Y. Feb.

24, 2006) ("[P]risoner plaintiffs need not plead exhaustion with particularity." (citation and

quotation mark omitted)).  Therefore, Moving Defendants' arguments on this point fail.

   Moving Defendants also cite to many cases where courts have dismissed claims as a

matter of course because it would have been temporally impossible for the plaintiffs to have

exhausted their administrative remedies before filing the complaints.  However, in those cases,

either (1) the courts knew, from the face of the complaint and incorporated documents, the dates

of all the relevant grievances and appeals at issue; or (2) the period between the date of the

alleged incident and the filing of the complaint was 21 or fewer days.  *See Amaker v. Bradt*, 745

F. App'x 412, 413 (2d Cir. 2018) (holding that plaintiff could not have exhausted where "he filed

the complaint at issue here 11 days after filing the grievance"); *Gayot v. Perez*, No. 16-CV-8871,

2018 WL 6725331, at *6 (S.D.N.Y. Dec. 21, 2018) (holding that it was clear from the date of an

appeal to the CORC, which occurred seven days after the date of the filing of the initial

complaint, that the plaintiff could not have exhausted all administrative remedies); *Perez v. City

of New York*, No. 14-CV-7502, 2015 WL 3652511, at *3 (S.D.N.Y. June 11, 2015) (dismissing

for failure to exhaust where the plaintiff stated in his complaint that he had not appealed from the

"first step of the IGRP's administrative procedure" and the plaintiff filed his complaint only one week after the incident occurred); *Pierre-Louis v. Martinez*, No. 12-CV-2240, 2014 WL 4161960, at *4 (E.D.N.Y. Aug. 19, 2014) (holding that "it is apparent from the face of the [c]omplaint" that plaintiff did not exhaust all administrative remedies because it was filed "a mere three weeks after the alleged date of the incident"); *Price v. City of New York*, No. 11-CV-6170, 2012 WL 3798227, at *3 (S.D.N.Y. Aug. 30, 2012) (same). Given that the pertinent exhaustion deadline is October 12, 2018, even some of the latest allegations, which occurred in March 2018, (SAC ¶¶ 246–48), pre-date the SAC by far more than 21 days. As discussed above, the Court also cannot be certain from the pleadings alone that it has all the relevant grievances necessary to determine whether Plaintiff exhausted his Green Haven claims before filing the SAC.

Additionally, although courts may "frequently convert[] defendants' motions to dismiss to motions for summary judgment on the limited issue of administrative exhaustion," *Garvin v. Rivera*, No. 13-CV-7054, 2015 WL 876464, at *5 (S.D.N.Y. Feb. 28, 2015) (collecting cases), it is also imperative that "the Court must [] allow Plaintiff the opportunity to take discovery," *Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *5 (S.D.N.Y. Dec. 21, 2016) (citation omitted). "Consequently, in order to facilitate the parties' abilities to offer evidence in the PLRA exhaustion context, courts typically have insisted upon limited discovery before converting a motion to dismiss for failure to exhaust administrative remedies into a motion for summary judgment." *Jones v. Sposato*, No. 16-CV-5121, 2017 WL 4023135, at *5 (E.D.N.Y. Aug. 22, 2017) (collecting cases).

Accordingly, the Court orders the Parties to conduct limited discovery, to be completed within 60 days of the date of this Opinion, solely on the issue of administrative exhaustion of the Green Haven incidents.

d.  Freedom of Association Claim

Moving Defendants argue that Ms. Miller fails to state a claim for freedom of association with Plaintiff, her son, and that, in any event, Moving Defendants would be entitled to qualified immunity for all of their actions.  (Defs.' Mem. re Mot. To Dismiss 30–31.)

It is axiomatic that an inmate "does not retain rights inconsistent with proper incarceration," and "freedom of association is among the rights least compatible with incarceration."  *Overton v. Bazzetta,* 539 U.S. 126, 131 (2003).  Moreover, the Supreme Court has explained that "any attempt to forge separate standards for cases implicating the [First Amendment] rights of outsiders [and inmates] is out of step" with Supreme Court precedent.  *Thornburgh v. Abbott*, 490 U.S. 401, 410 n.9 (1989); *see also Sealey v. Olszewksi*, No. 14-CV-3, 2015 WL 9484521, at *4 (W.D.N.Y. Dec. 29, 2015) ("In the prison-visitation context, the visitor's rights are necessarily tied to the inmate's [rights]." (citations omitted)).  Thus, although the Constitution "protects certain kinds of highly personal relationships" and there exists "a right to maintain certain familial relationships, including association among members of an immediate family," "[s]ome curtailment of that freedom must be expected in the prison context."  *Overton*, 539 U.S. at 131 (citations and quotation marks omitted).  To the extent a prison procedure curtails a prisoner's freedom to associate, the prisoner's constitutional right is not violated if the procedure "bear[s] a rational relation to legitimate penological interests."  *Id.* at 132; *see also Patterson v. City of New York,* No. 11-CV-7976, 2012 WL 3264354, at *7 (S.D.N.Y. Aug. 9, 2012) ("[L]imitations on visits that are reasonably related to a legitimate penological interest do not violate a prisoner's constitutional right.").  Moreover, the Court "must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the

most appropriate means to accomplish them." *Overton,* 539 U.S. at 132; *see also Hunter v. City of New York*, No. 10-CV-3532, 2015 WL 5697218, at *10 (S.D.N.Y. Sept. 28, 2015) (same).

Here, Ms. Miller appears to allege that her freedom of association rights were violated when Plaintiff was detained in the Green Haven infirmary from May 18, 2017 until July 8, 2017, during which she was unable to maintain letter or phone contact with Plaintiff. (SAC ¶¶ 177, 196, 274.) Moving Defendants point to cases demonstrating that long-term impositions on *visitation* rights fail to state a violation of the constitutional right to freedom of association as to non-inmate family members. (*See* Defs.' Mem. re Mot. To Dismiss 30.) But the Supreme Court specifically has noted that there is *some* right to association in the context of prisoners and their families, *Overton*, 539 U.S. at 131, and that the availability of communication "with persons outside the prison by letter and telephone" generally supports the conclusion that a visitation restriction may be reasonable, *id*. at 135. However, "[w]ere it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable." *Id*. Following this principle, in *Hernandez v. McGinnis*, 272 F. Supp. 2d 223 (W.D.N.Y. 2003), the court considered the constitutionality of a prison's visitation restrictions and concluded they were constitutional because the inmate was still able to communicate with others via letter and telephone. 272 F. Supp. 2d at 228. Here, however, Moving Defendants have not proffered any penological interests that support a total ban on telephone and letter communication between Plaintiff and Ms. Miller while Plaintiff was confined in the Green Haven infirmary. (*See* SAC ¶¶ 177–81; *see* Defs.' Mem. re Mot. To Dismiss 30.)

Nevertheless, the implicated Defendants are entitled to qualified immunity. "Qualified immunity protects officials from liability for civil damages as long as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (citations and quotation marks omitted).  In determining whether a right is clearly established, the "inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (citation and quotation marks omitted).  "In the Second Circuit, 'a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004)).  Further, qualified immunity is an affirmative defense, *Lore v. City of Syracuse*, 670 F.3d 127, 149 (2d Cir. 2012), one that "[t]ypically . . . will rest on an evidentiary showing of what the defendant did and why," *Amaker v. Lee*, No. 13-CV-5292, 2019 WL 1978612, at *17 (S.D.N.Y. May 3, 2019) (quotation marks omitted) (ultimately citing *Curry v. City of Syracuse*, 316 F.3d 324, 334 (2d Cir. 2003)).  Where the qualified immunity defense is raised "at the motion to dismiss stage, defendants must accept a more stringent standard."  *Id.* (quotation marks and alterations omitted) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).  "Not only must the facts supporting the defense appear on the face of the complaint, but . . . the motion may be granted only where it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief."  *McKenna*, 386 F.3d at 436 (citations and quotation marks, omitted)).

     The right Ms. Miller seeks to vindicate in this Action has not been clearly established by either the Supreme Court or the Second Circuit.  In *Overton*, while the Supreme Court

acknowledged that "certain kinds of highly personal relationships" are protected under the Constitution, it also decided that "[t]his is not an appropriate case for further elaboration of those matters." 539 U.S. at 131 (citation and quotation marks omitted). Indeed, the Supreme Court further explained that an "inmate does not retain rights inconsistent with proper incarceration," with "freedom of association [being] among the rights least compatible with incarceration." *Id.* (citations omitted). Furthermore, while the Supreme Court speculated that "[i]f the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations," *id.* at 137, the facts here do not involve anything close to the two-year deprivation at issue in *Overton*.

Simply put, in the wake of *Overton*, it cannot be said that the Supreme Court has recognized a right to visitation, even from a close family member, "or, at the least, that there is such a right that cannot be abridged or suspended by prison authorities for as long as the [seven weeks] at issue in this case." *Malavé v. Weir*, No. 16-CV-0009, 2018 WL 500644, at *5 (D. Conn. Jan. 22, 2018), *aff'd*, 750 F. App'x 65 (2d Cir. 2019). "Nor has the Second Circuit recognized a right to visitation or telephonic contact between [close family members] where one of the persons is in prison." *Id.* at *6; *accord Williams v. Ozmint*, 716 F.3d 801, 806 (4th Cir. 2013) ("Williams does not cite any case, or combination of cases, from this [c]ourt, the Supreme Court, or the highest court in South Carolina, that clearly establishes a constitutional right to visitation in prison grounded in the First, Eighth, or Fourteenth Amendments." (citation omitted)); *Dunn v. Castro*, 621 F.3d 1196, 1202 (9th Cir. 2010) (granting defendants qualified immunity based on the Supreme Court's "hesitation in articulating the existence and nature of an inmate's right to receive visits from family members"); *Flynn v. Burns*, 289 F. Supp. 3d 948, 965

(E.D. Wis. 2018) ("Circuit courts have recognized the analytical lacunae left in the wake of

*Overton*.").[5]  Thus, the Court dismisses this claim on qualified immunity grounds.

### III.  Conclusion

For the reasons stated above, Plaintiff's Motion for Sanctions is denied and Defendants'

Motion To Dismiss is granted in part and denied in part.  All claims related to Franklin and

Upstate are severed and transferred to the Northern District of New York; the Green Haven

claims remain in this District.  Plaintiff's PREA-reporting claims are dismissed for failure to

state a claim.  Ms. Miller's claim for freedom of association is dismissed with prejudice on

qualified immunity grounds and therefore any amendment would be futile.  *See Jin v. Metro. Life*

*Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002) ("[T]he district court has the discretion to deny leave

---

[5] In *Mills v. Fischer*, 497 F. App'x 114 (2d Cir. 2012), the Second Circuit considered an appeal from a dismissal of a lawsuit claiming a constitutional right to visitation between a prisoner and two of his family members.  Citing *Overton*, the Second Circuit "assum[ed] that inmates and their families have a right to visitation protected by the First Amendment," and then further concluded that the complaint "does not state a plausible violation of that right." *Fischer*, 497 F. App'x at 116.  The Second Circuit's hypothetical assumption of a right does not create clearly established law.  It is true that the Second Circuit went on to state that "[o]n the other hand, the intentional or malicious deprivation of visitation to a prisoner, even on one occasion, could rise to the level of a constitutional violation," *id.*, but this statement was dicta and equivocal ("*could* rise to the level"), and it all appears in the context of an unpublished summary order. *See* Second Circuit Local Rule 32.1.1 (limiting precedential effect of a summary order). "[E]ven if [the Court] were to accept that a summary order like the one issued . . . in *Mills v. Fischer* may create clearly established law that 'counts' for qualified immunity 'clearly established law' purposes, [the Court is] left with the fact that the one helpful statement for [P]laintiff[] from *Mills v. Fischer* is both dicta and equivocal in nature, while the rest of the ruling does no more than assume that there is a constitutional right to visitation among family members." *Malavé*, 2018 WL 500644 at *7.

[to amend] if there is a good reason for it, such as futility . . . ." (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Court also orders the Parties to conduct limited discovery on the question of administrative exhaustion as to the Green Haven claims, to be completed within 60 days of the date of this Opinion.

The Clerk is respectfully directed to terminate the pending motions, (Dkt. Nos. 210, 237), and mail a copy of this Opinion to Plaintiff.

SO ORDERED.

Dated:   September 26 , 2019
         White Plains, New York

                                        KENNETH M. KARAS
                                        United States District Judge